Thank you. May it please the court, counsel. I'd like to begin the argument by addressing a question that was raised at the closing argument and in the court's memorandum opinion and order below. And it was a criticism of this case. And what the court said was, essentially, well these 51 gentlemen in this collective class that want to get paid for performing work off-duty on their BlackBerry devices, they have sued the department, the City of Chicago, their employer. Why on earth do they not test their employer? Why don't they fix this matter and submit time slips? Why don't they say, hey, I work the overtime, pay me. And I want to return to that question and start with the answer to that question. When every single one of the collective class, anyone that gets a BlackBerry in the Chicago Police Department, they are made to sign a compliance statement upon issue. You have to sign it. What does the compliance statement say about off-duty work? It says, if I access my department email account, respond to electronic messages, or use the department-issued electronic communication device related to department business off-duty, I will not be compensated. Unless I am on an official callback assignment, as defined in a labor agreement, or I'm directed by my superior to immediately perform a substantial task with overtime authorization from the superior directing the request. Now, that's the first thing they get to see when they get that BlackBerry. And they're told, you keep that on 24-7 and you will respond. Now, the district court, in its decision, leads the city to argue that the Seventh Circuit here should adopt White versus Baptist Memorial, a case out of the Sixth Circuit. And I would suggest that would be something that the Seventh Circuit should resist. It has always been, and it remains the law in this circuit, that when an employer has actual or constructive notice of overtime work being performed, the employer has to pay for it. Now, the district court... Do you think White is mistaken? I do think White is mistaken. Then why did you ignore it in your opening brief and not make such an argument in your reply brief? Your reply brief says, Dear Seventh Circuit, please ignore White. Yes. So I look for an argument in which you contend that White is legally incorrect, and I didn't find it. Did I miss it? No, you did not miss it, Your Honor. All right, well, that's a big problem. Well, I can answer. No, it's too late, an oral argument, to attack a decision that very strongly supports your opponent. That's what the briefs are for. Right. And it was conspicuous that your briefs never contend that White is incorrect. Because it was our contention on reading the Memorandum of Opinion and Order that the court relied on Keller versus some exceeding. And that's the first case I believe the court takes in its Memorandum of Opinion and Order. I do not believe that district courts' choices in writing opinions constrain the discretion of the Court of Appeals. If you've got an adverse precedent, and White is about as adverse to your clients as it can be, you have to anticipate that the Court of Appeals may follow it. You don't just ignore it in your opening brief, which is what you did. Well, I apologize. The White itself, we would love to have had the facts of White. Because look at the factual underpinning of White. There was a process. There was, I believe, a handbook given to White. There was a process for making claims on lunch breaks. One more question about White. Has any Court of Appeals disagreed with White? Well, I don't think there's necessarily disagreement. I think most of the Court of Appeals citing it are citing our lunch cases. Well, look, it's a simple question. Has any Court of Appeals disagreed? Not that I'm aware of. Okay. Sorry, Ron. So, you know, we didn't believe White was the case that the district court relied on. It just doesn't matter what the district court relies on. We address the party's arguments. And the city of Chicago has relied on White. Right. Then and now. Okay. And we address that, unfortunately, in our reply brief versus our initial filing. The situation in White was these employees had to sign a document saying that they knew what the procedure was to get overtime when they worked during their lunch break. None of the 51-member collective class ever had to sign anything saying, we know the procedure to get overtime pay when we work on our BlackBerry devices, because there was no such procedure. There was no specific procedure, but they all knew how to ask for overtime, right? They all knew how to ask for overtime. The only type of overtime that was differentiated was BlackBerry overtime, and that was a result of the filing of this action that started in 2010. So, yes, did they know how to get overtime? Sure. But consider where they work. Consider the things that you don't see in the Memorandum of Opinion and Order. They are led by a chief, Rody, one of the highest-ranking members of the Chicago Police Department. He said when he was non-exempt, he would work for free. And he said he felt that was his right. It's not his right as a non-exempt person. Mr. Geiger, let me just lay out my concerns here. You can cite and have cited a great deal of evidence that supports your position. If the district judge had tried to resolve this case on summary judgment, probably it would have had to go back for the trial that you've already had. There was plenty of evidence the other way. Your Honor, respectfully. We're on clearly erroneous review. Respectfully, I would disagree with that. Okay, please. There was plenty of evidence the other way. And here's an example. The district court talked about saying the city was generally unaware of the off-duty BlackBerry work. That's, I believe, a statement from the Memorandum of Opinion and Order. That is incorrect. There's no citation. There's citations in the Memorandum of Opinion and Order, but there's no citation for that proposition. To that, we offered, I think, 13 or 14 different witnesses, including some of their witnesses, that said, yes, indeed, we were aware. I thought the theory was that the city was aware that such work might be done, but was not keeping track of whether the officers were submitting overtime pay requests for it, because there's no special category of, quote, BlackBerry work. Well, the city sort of made one when it issued general orders that essentially put up a bunch of roadblocks to anyone submitting an overtime slip for the BlackBerry work. And that is, you know, unfortunately the difficulty I have here is we are arguing that the district court got it wrong. And, you know, hence we have this giant. We're used to hearing arguments like that. Well, it's a generalist argument. And the problem I have is we have all the sites. Did you offer any evidence that requests for overtime pay for this off-duty BlackBerry use were ever refused? Were ever refused? No. Somebody asked. Pardon me? There were some of the 51 who did request, right? They knew how to do it and got paid, right? Okay. Some of the 51. There were two that testified. One that didn't testify, but the district court said he did testify. There were two. And those two were plaintiffs in this case, Hamilton and Paydar. And what those two also said was they only did it when they worked two hours or more. Okay. Well, that was another question I had. How long did they do it? Did everybody keep track of their time? On their... All of the 51. Did they make notes about how much time they spent? Five minutes, ten minutes, or two hours? No. We submit, Your Honor. Then how the heck do you get any payment if they didn't even keep track of it? Easy. We showed that at the trial, Your Honor. We showed that with the phone records. For phone records and emails, you have an electronic... You have an electronic... For time used. Right. Record of time used. So you assume every bit of that time was off-duty work. I must say I don't understand that technically. You may have records of at what time an email was sent, but where's the record for how much time was spent composing it or reading the emails that led to its composition? That, Judge, we do not have. Yeah. And that's sending an email is the work of an instant. Right. But the compensation sought would be for the time composing or for thinking about or for reading the emails that led to the response. Right. Judge, my time is up. Thank you. Mm-hmm. Thank you, Mr. Geiger. Mr. Breyer. Thank you, and may it please the Court. This Court should affirm the judgment of the District Court. At the trial in this matter, plaintiffs uniformly admitted that the supposed overtime for which they seek compensation was never reported to the city in accordance with the city's established reasonable practices for reporting time. The city's procedure is if you have overtime, there's a slip to fill out, report the time, and it's paid. By failing to comply with those reasonable procedures, their plaintiff's FLSA claim is barred, absent a showing of two particular exceptions to the rule. First, that the city somehow affirmatively prevented plaintiffs from reporting their time, whether through a policy or through some other means. The plaintiffs chose in this case to proceed by attempting to show a policy or in a case in which the city could be shown to actually know that the overtime had worked and was not paid. Neither showing was made here, and the District Court's findings in that regard were not clearly erroneous. First, responding to Judge Easterbrook's question regarding the status of white, at present no court of appeals has disagreed in any way with the statements in white. Of course, I have the reverse question for you. Has any court of appeals agreed with white? So far it does not appear that any court has addressed white. No one else is really seriously engaged in this issue. So there's white. There is a Sixth Circuit opinion post-white that seems to follow along with white, notes the exceptions. That's all within the same circuit. That's precedent. But in that regard, white, we wouldn't expect there to be a disagreement on that point. No reason for disagreement has been offered by plaintiffs' counsel. But given that the white rule is basically a culmination of a line of authority that I believe can be traced back to at least the early 1970s, the Brumbulow decision, I believe, is one of the earliest examples, it appears this has been a consistent. Okay. White basically is what it is. There was a dissent in white but not on the legal point. Correct. It was on the point similar to the one Judge Hamilton flagged, the difference between summary judgment and trial. Correct. And I believe in the reply the portions that plaintiffs quote from white were actually quotes from the dissent rather than the majority, just to flag that issue there. But, again, there was no evidence here of actual knowledge of unpaid overtime. There was no evidence of a policy for sure, unwritten or written, that prevented the payment of overtime. Well, there was some evidence of, and that's why this went to trial. That's why there was a problem. There might have been a ---- I guess the question I have, Mr. Meyer, is given the broad statutory language of suffer or permit to work and the concerns that led Congress to write the FLSA as broadly as it did to avoid evasion of it, does a supervisor who knows that off-duty work or off-schedule work is being done have any duty to follow up and see if the employee has actually been paid for that work or has requested pay for it? My understanding of the law is that there are some broad statements that employers are required to keep track of the prevailing nature of their industry, the prevailing conditions of the industry. It's not clear where that goes. It's such a broad statement. It's not clear what the point is. In this context, you've got devices that are basically going to be on 24 hours a day, police officers who are going to need to respond, who can expect to be called upon to respond to off-duty, whether it's a source that's contacting them or an emergency that comes up. So it seems to me a supervisor is going to know in general that at least some off-duty work is going to be conducted that way, right? That's why those devices are provided, right? Right, and we're not trying to push back against that knowledge of work, but why it's quite clear that there are two components and there has to be knowledge of both. It's knowledge of the work and the knowledge that the work was not being paid, and that's where plaintiffs run into the problem here. There's absolutely no evidence in this record that the supervisors ever knew that this work wasn't being unpaid or that they had reason to know. We say that constructive knowledge shouldn't be considered. It's your theory, as I understand it, though, that if you've got the knowledge that the work is being done and the city has set up a reasonably convenient process for taking care of that, it's okay to just put the onus on the employee without further supervision. Absent some sort of affirmative knowledge that it's not being complied with, and what we have here is the opposite of that. We have supervisors who testified that they were under the belief that this time was being reported. They had every reason to believe that when it was possible. Oftentimes it wasn't possible because no one's listing how work is performed. The city considered it irrelevant, but when they had some sort of reason, some sort of ability to ascertain from what was submitted to them that there was BlackBerry work being done, it was being paid. Plaintiffs have cited not a single instance ever in which an individual reported his time to the city in compliance with the procedures, reasonable procedures set forth for reporting overtime, and that time was not paid. Even the plaintiffs were paid for that time on multiple occasions. Was there some time when your opponent said something about 15 minutes? Was that a policy? There's nothing in the record. Okay, and then this whole thing pervades in every business. I don't know. I can give personal examples. But people who are off work have their phone, et cetera, and are called lots of times, and there's lots of work, and there's some question in other businesses about how they're going to compensate for that. And there's a lot of talk about that because it is a lot of time after the office closes. But in this case, it seems that there are, well, they say there's only two people, but is there a change in policy now? A change? Sorry, I'm not sure I follow. A change of policy where it's much more precise now after this case? The written policy, the written general orders, have not been changed to my knowledge since 2013. Okay, well, I'm just looking from a practical standpoint because what we're looking at here, I see no way how you can even compensate these people when they don't keep track of their time and don't have a documented thing. As Judge Easterbrook points out, the phone call is almost irrelevant. It's the time spent developing and reacting to and all that sort of thing. And that's exactly the problem the city is faced with here. And there was testimony that it was impossible to know because it's not just calls from supervisors, it's calls from confidential informants, it's calls from subordinates, that a supervisor would have no way to ascertain, on his or her own, that there was work being formed or how much work was being performed. I'm just wondering if there's a way now, with timesheets and something people carry in their pocket or whatever, along with their BlackBerry, that there's some use of it. I don't know. It sounds bureaucratic, but I'm just curious. I have no knowledge. There's nothing in the record on that. But the issue is that plaintiffs implicitly concede this point that the time slips are, they don't differentiate between BlackBerry and otherwise. This was a construct of the plaintiffs in this case. The plaintiffs in this case, for reasons that the plaintiffs themselves differed on, decided that BlackBerry work was somehow different than everything else they did, that for some reason holding a BlackBerry in your hand was somehow a unique event that would not be compensated. But it was all speculation. Is this confined to the Bureau of Organized Crime? This case is. The plaintiffs were all members of Bureau of Organized Crime, so no evidence that I'm aware of was ever taken or sought regarding other bureaus of CPD, which for operational reasons might not have BlackBerrys. I can't speak to that because of the state of the record. But this was limited to the BOC. So the plaintiff's best evidence are the general orders, right, which are pretty hard to reconcile with the FLSA. I don't believe they are. The problem I have with, the problem I think is presented with plaintiffs' reading of these orders is plaintiffs have taken an interpretation. They say, look how ridiculous these orders are. It's impossible to get compensation. That's a ridiculous requirement that doesn't apply to the FLSA. But the response is, those requirements are ridiculous because they're being misread. There's no requirement that a supervisor in advance authorize somebody to seek overtime. Plaintiff Allen himself admitted, when I get an email, I know that it's implicit in that, that I'm being authorized to answer that email and do what's being told. And the undisputed testimony, gobs of testimony in this case, was that the nature of police work precludes such a requirement from being ever read in between the lines of these orders, that it's typical that officers are working, they won't have an opportunity to speak with their supervisor about how to use judgment. Yeah, exactly. And the supervisors trusted their officers to use their judgment. And they testified it was a shock here that the officers weren't reporting their time when they never expected that to be the circumstance. I see my time is up if this court has no further questions. We respectfully request that you affirm the judgment of the district court in all respects. Thank you very much. Thanks to both counsel. The case is taken under advisement.